UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-----------------------------------------------------------X
VALERIE HARRIS,

                 Plaintiff,

    -  Against  -          **COMPLAINT AND JURY DEMAND**

WINCHESTER HOSPITAL,

                 Defendant.
-----------------------------------------------------------X

Plaintiff, by her attorneys, The Wagner Law Group, as and for her Complaint and Jury Demand, respectfully alleges as follows:

### THE PARTIES

1.      At all relevant times hereto, Valerie Harris, ("Harris") was and is a resident and domiciliary of the Commonwealth of Massachusetts.

2.      At all relevant times hereto, Winchester Hospital ("Winchester" of "Defendant") does business in Massachusetts with its principal offices located at 41 Highland Avenue, Winchester, Massachusetts 02155.

3.      At all relevant times hereto, Harris worked for the Defendant in the Commonwealth of Massachusetts.

### VENUE AND JURISDICTION

4.      This is a civil rights action brought by the plaintiff in order to redress multiple deprivations by the defendant of her rights under Title VII of the Civil Rights Act of 1964, as amended and Massachusetts General Law 151B.

5.      Jurisdiction is conferred on the Court by 28 USC 1331 and 28 USC 1343(a).

6.     Venue in the United States District Court, District of Massachusetts is appropriate pursuant to 28 U.S.C. 1391 inasmuch as acts and transactions constituting violations of the above acts have occurred in this District.

7.     Harris filed a complaint with the Equal Employment Opportunity Commission on January 10, 2014.

8.     Harris filed a complaint with the Massachusetts Commission Against Discrimination on January 10, 2014.

9.     Harris received a right to sue letter from the Equal Employment Opportunity Commission dated April 30, 2014.

10.     Harris received a right to sue letter from the Massachusetts Commission Against Discrimination dated May 30, 2014.

11.     This action has been commenced within ninety (90) days of receipt of both right to sue letters.

12.     Harris has exhausted her administrative remedies and has therefore complied with all jurisdictional prerequisites for commencing this action.

## NATURE OF THE ACTION

13.     This complaint is being filed because gender discrimination and retaliation in violation of Massachusetts and federal law.

## BACKGROUND

14.     Harris was hired by Winchester as the Supervisor of Courier Services on or about March 1, 2004.

15.     Harris works in the Security, Transportation & Parking department which is run by Director, Bradley M. Ross ("Ross").

16.     Ross has three direct reports, Associate Director Ron Knight ("Knight"),

Shuttle/Off-site Security Manager John Bella ("Bella"), and Harris.

17.     There are approximately 60 Security Officers.

18.     All of the Security Officers are male until one female was hired in February 2014,

after the Plaintiff filed her complaint with the EEOC.

19.     There are approximately 21 Shuttle Drivers.

20.     All of the Shuttle Drivers with the exception of one per diem driver are male.

## HARRIS' PERFORMANCE

21.     Senior management recognized Harris for assisting and packaging disaster
equipment.

22.     Senior management recognized Harris for responding to patient and visitor

dissatisfaction and for seeking out help for visitors waiting in the lobby.

23.     Senior management acknowledged Harris for working during a blizzard.

24.     Harris was honored with the "Above and Beyond" award.

25.     Senior management recognized Harris for organizing the shuttle service for a

company picnic.

26.     Harris was recognized for being instrumental in helping Winchester to maintain

its internal operations during a snowstorm.

27.     Senior management recognized Harris for her management during an incident

when a tree fell in the employee parking lot.

28.     Harris received the "Spot Award" for going above the call of duty for patients,

visitors, and staff.

29.     Harris received the "Pacesetting Employees Earn Recognition Award" in

recognition of her hard work.

30.    Harris was recognized by senior management for going above and beyond when she found the wedding ring of a deceased patient and brought it to the widower in an effort to bring comfort to him during an extremely difficult time.

31.    Harris received the "Leader to Leader" recognition on many occasions.

32.    Harris is the only member of the STP Management team to complete all four exams for IS-100, IS-200, IS 700 and IS 800.

33.    Senior management recognized Harris for her work in recognizing employees for outstanding performance and in preparing for events such as the employee picnic.

## HARRIS' INTERNAL COMPLAINTS

34.    On August 6, 2010 Harris complained to Ross that she was being treated differently and unfairly as compared to her male co-workers.

35.    On August 19, 2010 Harris brought HIPAA concerns to the attention of the legal department.

36.    In January 2012 Harris made a formal internal complaint of gender discrimination. On January 18, 2012 Harris answered specific questions about her gender discrimination complaint.

37.    On January 25, 2012 Harris met with Jeanne Philips of Human Resources regarding her complaint of gender discrimination.

38.    At least one co-worker told Human Resources that Harris was treated in a disparate manner.

39.    On April 25, 2012 Harris met with Kevin Smith, the President of Winchester and Robby Robertson ("Robertson"), a Vice President, about her complaint of gender discrimination.

40.     On October 15, 2013, Harris complained that Ross was harassing her due to gender.

41.     Robertson responded that Harris should address her concerns with Ross on a one on one basis.

42.     It became apparent that Winchester had no interest in attempting to address Harris' concerns of gender discrimination.

43.     As a result, Harris retained counsel who sent a claim letter to Winchester on October 29, 2013 by email and mail.

## THE SECURITY MANAGER POSITION

44.     Harris handled many aspects of the position from March 1, 2013 through November 15, 2013.

45.     On September 18, 2013 Harris applied for the Security Manager position.

46.     Harris has worked as the Security Manager at various times during the time that she has been employed at Winchester.

47.     On October 9, 2013. Harris was asked to set up interviews for the Security Manager position on Ross' behalf. However, there was no mention of an interview for Harris.

48.     On October 17, 2013 Ross interviewed Robert Arsenault for the Security Manager position. This interview had been scheduled several days in advance.

49.     On October 18, 2013 Ross spoke with Harris for the first time about her application for the position when he asked her to come in for an interview without any advance notice. Harris requested that she have time to prepare for the interview.

50.     On October 21, 2013 Ross interviewed Harris for the position. During the interview the following was discussed:

a.      Ross said that out of all the applicants Harris' resume was the best and was "spot on" needing no corrections to the information or formatting as all of the other applicants were in need of. He said how he had to offer suggestions to the other applicants on how to improve upon their resume;

b.      The two individuals who held that position in the past did not have a Bachelor's Degree. Ross said that the position required a level of education such as a Bachelor's degree. Harris stated that she should be given the same consideration. In addition, she has an Associates Degree and would be willing to go back to school for a Bachelor's Degree if necessary;

c.      Ross said that the position requires that the successful candidate be "on-call" and that he felt that Harris could not fulfill that requirement because she is a "working mom;"

d.      Harris mentioned that she has actual experience in filling the position as she had done many times over the years; and

e.      Ross then discussed his medical problems and how that had impacted his ability to return to school to obtain his Masters. This limited Harris' opportunity to discuss her qualifications and vision for the position.

51.     Mike Roberto ("Roberto") repeatedly commented about "when the new guy" would be hired for the position.

52.     Robertson indicated that he felt it necessary to sit in on Harris' performance evaluation with Ross and Harris in order to ensure that the evaluation was "fair" but did not deem it necessary to sit in on Harris' interview for the position with Ross.

53.     Harris was directed to schedule second interviews for the position with ten members of Winchester's staff.

54.     The position was upgraded from Security Manager to Associate Director.

55.     Harris was not notified of the change in the title.

56.     Upon information and belief, the change in title was done in order to preclude Harris from consideration due to the fact that she only has an Associate's Degree.

57.     On November 21, 2013 Harris learned that the position had been filled because Human Resources sent the notice of new hire to Harris as they do with all new hires so that they can get badge access.

58.     On November 25, 2013 Harris met with Ross and Becky Merrill ("Merrill") from Human Resources. Ross said that he wanted Merrill to be present because he wanted to tell Harris that the position had been filled by Knight and that Harris would report to Knight.

59.     Ross told Harris that none of the internal candidates were qualified.

60.     Harris had the same or better qualifications as compared to Bryan Meehan ("Meehan"), Kevin Gage ("Gage") and Roberto.

61.     Harris performed approximately 75% of the Security Manager position as well as her position throughout the majority of 2013.

62.     Harris was denied the opportunity to interview with other department directors.

63.     Ross should not have denied Harris an interview because of her complaints of gender discrimination.

64.     Ross' stated reason during her interview for not considering Harris because of the fact that she is a working mom is evidence of gender discrimination.

65.     Ross' stated reason why Harris was not qualified because she did not have a bachelor's degree is evidence of gender discrimination and disparate treatment, because he had filled the position with internal male candidates who also did not have a bachelor's degree.

## HARRIS' CASE

66.     Harris has been treated in a disparate manner as compared to her male colleagues.

67.     Ross has stated on several occasions that Harris could not handle positions due to her being a female and a working mom.

68.     Ross has refused to allow Harris to attend trainings and to advance in her career due to her gender and the fact that she is a mother.

69.     Ross has assigned secretarial tasks to Harris due to her gender.

70.     Ross has retaliated against Harris by:

a.      stripping her of responsibilities;

b.      refusing to consider her for promotion;

c.      disciplining her;

d.      giving her a poor evaluation;

e.      dooming her to failure by removing her from an email distribution list; and

f.      by demeaning and humiliating Harris in the presence of her colleagues.

71.     Winchester failed to properly investigate Harris' complaints.

72.     Winchester treated complaints made against Harris in a disparate manner as compared to complaints about male employees.

73.     Winchester allowed Ross to interview Harris for a promotion even though he was the subject of her complaints of discrimination.

74.     Winchester allowed Ross to change Harris' job description to make it more of a clerical position even after Harris had complained of discrimination.

75.     As a result of the above, Winchester has discriminated against Harris because of her gender and because she is a working mother and in retaliation for her prior complaints of gender discrimination.

## HARRIS' EMPLOYMENT

76.     From 2004 through 2010 Harris often worked on management initiatives. The following are intended as examples of projects that she worked on: she addressed issues concerning Winchester's neighbors; investigated complaints; represented Winchester at a Massachusetts Rides meeting; assembled and completed paperwork for a Code Red; handled the shuttle contact position while it was vacant; assessed a facility after a power outage; notified drivers to cease and desist from feeding animals; was on-call during off hours; addressed harassing calls received by the Operating Room; ordered equipment such as fire extinguishers; addressed threats made by a patient; worked on a potential child abuse complaint; handled breaches of security; completed an investigation of a stolen wallet; handled staff exposure to MRSA; staffed officers during a snow event; she counseled employees; identified cost savings for Winchester; oversaw Security payroll; oversaw Shuttle payroll; covered Shuttle Supervisor position during a management transition period without additional compensation; spearheaded a campaign to make donations to Haiti after a natural disaster; and handled a medical emergency.

77.     In 2010 Harris received "Outstanding Contributor" in one section and "Valued Contributor" in another section on her evaluation. Ross commented that since Harris had gone through a divorce, she may not have been entirely focused.

78.     In 2011 Harris received an overall rating of "Opportunity for Improvement." This was later changed to "Valued Contributor" after Harris complained to Human Resources about gender discrimination.

79.     In 2012 Harris received a rating of "Valued Contributor" but did not receive the full 4% raise and had goals set that were not given to male colleagues.

80.     Harris did not receive her performance evaluation in March 2013 consistent with Winchester's policies.

81.     On March 5, 2013, Harris met with Robertson because she had not been given her review. Harris made several attempts to obtain her performance evaluation in 2013.

82.     Harris received her performance evaluation on October 3, 2013 and was rated a "Solid Performer." Despite that rating Harris received a 3.5% raise as opposed to a 4% raise.

83.     Harris handled the shuttle payroll in 2013.

84.     Harris was responsible to handle urgent security matters during a portion of 2013.

85.     Harris was responsible to handle scheduling for security during a portion of 2013.

86.     Harris worked during a weekend to handle security and shuttle payrolls despite that this was not part of her regular job description.

87.     On October 8, 2013 Harris received an email from Payroll indicating that there was an urgent deadline regarding payroll due to an upcoming holiday.

**Example of Disparate Treatment and Discrimination**

88.     In 2005 Meehan had an angry and violent outburst directed at Harris. Although Ross was aware of the outburst, he failed to intervene or to discipline Meehan. As will become apparent herein, Ross disciplined Harris for lesser reasons.

89.     In 2005 Harris' daughter's photo which was maintained on her desk was defaced. Harris brought this to the attention of Ross. However, he failed to take steps to determine how the photograph was destroyed.

90.     Beginning in 2005 and continuing until present, Ross assigned traditionally female tasks to Harris and not to her male counterparts because of her gender. For example, on June 16, 2005 Ross sent an email to Harris requesting that she replace reams of paper.

91.     Ross frequently refused to allow Harris to attend important events such as a Security Expo in April 2006 that was attended by four male co-workers.

92.     In August 2006 Ross allowed two male colleagues to attend the IAHSS New England Breakfast seminar. Harris was not permitted to attend.

93.     Ross refused to appoint Harris as the new Shuttle Supervisor because he perceived Harris as unable to be available 24/7 due to "mom duties" and stated that it would not be a good fit because Harris is a working mom.

94.     On September 7, 2007, Ross and Gage attended a seminar in Maine. Harris was not invited.

95.     On October 15, 2007, Walsh, Gage and Ross compiled a list of Lead Officers and excluded Harris despite that she works closely with the staff.

96.     In February 2008, Ross requested funding for Ross, Roberto, Jose Saenz ("Saenz") and Louis Kiefor ("Kiefor") to attend an IAHSS training seminar on February 25, 2008. Harris was not invited to attend the seminar.

97.     On March 3, 2008 Ross offered advanced security officer training to Roberto, Saenz and Kiefor. Upon information and belief, this training was never made available to female officers. The training was not offered to Harris.

98.    On March 31, 2008 Ross placed Harris on a list of people to be recognized on Administrative Professionals Day.

99.    On April 30, 2008 Ross, Roberto, Bella and Gage attended a one day Security Expo. Harris was not permitted to attend.

100.    On May 14, 2008 Ross arranged for Roberto to receive C-Cure training even though Harris used the system and was not permitted to train on it.

101.    On May 22, 2008 Ross, Meehan, and Bella attended a Leadership Conference. Harris was not allowed to attend the conference.

102.    In or about July 2008, Ross attended a golf tournament with Harris' male co-workers. Harris was excluded from the event.

103.    Ross and Gage attended the IAHSS holiday dinner in 2008. Harris was excluded from the event.

104.    In the spring of 2009 Theobald and Brito attended training. Upon information and belief, this training was never made available to female officers. The training was not offered to Harris.

105.    Harris was not given additional compensation when she covered positions for colleagues. Upon information and belief, male colleagues were given additional compensation when asked to pick up work outside of their job descriptions.

106.    Ross and Bella attended the 2009 New England Regional Breakfast seminar. Once again, Harris was not permitted to attend.

107.    On September 9, 2009 Ross asked Harris to schedule a meeting between Ross and male co-workers to develop an elevator policy and plan. Harris was not included in the meeting despite her experience with its operations.

108.    In December 2009 Ross decided to have Bella work with him on the ED Psych Task Force and excluded Harris. Harris works with staff on the same issues.

109.    On March 1, 2010 Ross excluded Harris from work on the Security Management Plan.

110.    On June 29, 2010 Ross sent a memo promoting Bella and Meehan from supervisors to managers. Harris was deprived of the opportunity to attend seminars and training events that were given to her male colleagues. Ross prevented Harris from having the same opportunities to advance her career that were given to men.

111.    In July 2010 Ross accused Harris of complaining about not getting a break or a t-shirt during the Employee Picnic. Harris never complained and suggested to Ross that they speak with the person who made the accusation to clarify the situation. Ross refused to have the meeting and used this situation as a basis for disciplining Harris.

112.    On July 22, 2010 Ross made a false accusation that Harris accused him of failing to respond to a "stat" call for assistance.

113.    On August 6, 2010 Harris was told to "badge out" for a doctor's appointment. Male co-workers were able to attend medical appointments without having to badge out.

114.    On or about September 16, 2010 Roberto threw a wad of paper at Harris. Roberto was not disciplined for his actions.

115.    Harris was excluded from attending the IAHSS Holiday Party in 2010.

116.    On many occasions in 2011 Ross demanded that Harris act as his secretary. This included scheduling programs, do typing and to print documents for him.

117.    On May 25, 2011 Ross excluded Harris from the process of handling a shuttle complaint despite that Harris had done this successfully in the past.

118.    On August 5, 2011 Ross sent an email to Harris demanding that she add notes for any day that she works more than 8 hours. He does not make male members of STP Management write similar notes if they work more than 8 hours.

119.    On September 21, 2011 Ross prepared a memo about STP job responsibilities to help staff identify which STP management member to go to. Ross stripped Harris of most of her responsibilities and told Harris that she was in charge of pens and paper.

120.    On September 26, 2011 Ross placed Harris on a Performance Improvement Discussion ("PID") because Harris spoke with an employee who came to her.

121.    On October 18, 2011 Harris began an investigation after a courier dropped 62 patient files on the street. Ross told Harris to not put anything in writing because of potential HIPAA violations. On October 28, 2011 Harris received an email from the legal department about an action plan for the 62 patient files that were missing.

122.    In 2011 Ross often attended meetings and seminars with male colleagues and excluded Harris. He demanded that Harris process payments or otherwise schedule these meetings even though she was forbidden from attending. This occurred on May 30, August 7, October 11, October 18, October 19, and October 24.

123.    In 2012 Ross repeatedly demanded that Harris perform secretarial tasks ranging from fetching pens to scheduling appointments to handling personal typing. This occurred on January 4, February 8, March 7, March 15 (twice), March 27, May 29, June 7, June 11, June 18, July 19, July 26, August 21, August 31, September 26, October 4, October 11, October 15, October 18, October 24, November 16, November 24 and November 28.

124.    On January 6, 2012 Harris received a Performance Improvement Agreement ("PIA") based on two incidents where Harris supposedly failed to display a proper level of

professionalism. The allegations were false. Even if true, men have done far more egregious things without discipline.

125.    On February 24, 2012 male security officers were seen on video using cell phones during a STAT call and yet they were not disciplined despite that their actions could jeopardize patient safety.

126.    In March 2012 Meehan yelled and screamed in the office. Ross did not discipline Meehan. This is another example of disparate treatment.

127.    On April 4, 2012 Harris attended a meeting with Ross and Merrill of Human Resources to review her job description. Upon information and belief, the men in the office did not need to have their job descriptions reviewed. Ross insisted that Harris should handle his typing and typing for men at a similar level because their time is more important than hers.

128.    Several additional meetings were held regarding Harris' job description. At the end of the process the job description was shifted from a supervisory role to more of an administrative and clerical role. Harris was stripped of a significant portion of the work that she had successfully performed for several years.

129.    Changes in Harris' position included but were not limited to:

a.    Ross removed Harris from performing at the Physician's Orientation as she did several times each year from 2004 to 2012. Harris would give a presentation to new physicians which focused on an overview of the services provided by her department. Ross said that this should be done by one of her male co-workers as they are managers and he considers it a function of a manager and it's not an administrative duty;

b.    Ross removed Harris from receiving Crisis Prevention Intervention ("CPI") training even though she had already begun the classes and was due to complete the program that

week. Harris had been certified in CPI every year since 2004. Ross justified the removal from

this certification because he said that Harris' function was that of a "secretary" who was

expected to answer phones and not respond to STAT calls like her male co-workers. Harris had

responded to STAT calls ever since she was hired in 2004. This meant that Harris was no longer

allowed to perform patient watches because she had to have the specialized training. It should be

noted that it was humiliating for Harris when her male co-workers learned that she would no

longer respond to patient assist calls because her job was to cover phones and order pens and

paper. Harris became the butt of jokes when it became clear that she was the subject of Ross'

ridicule;

     c.     Ross removed Harris from handling payroll. Harris was allowed to input payroll

updates on the computer but no longer had the authority to approve a time card. He reasoned that

input on the computer was a clerical task;

     d.     Harris was no longer entitled to make decisions on security operations, staffing,

coverage, investigations, responding to complaints or handling issues that arise on a day to day

basis. Harris was stripped of all authority and was instructed to refer all such matters to her male

co-workers even if they were not available to respond to an issue.  Harris was instructed to page

her male co-workers if needed. Prior to the change Harris was able to cover for her male co-

workers as needed in all operational aspects of the department and make the necessary decisions.

In fact, Winchester frequently commended Harris for her ability to perform all of these functions

and because she was an asset to the hospital and to the community;

     e.     Ross removed Harris from performing body releases from the morgue; and

f.     Ross removed Harris from responding to emergencies/codes such as STAT calls, fires, infant abductions or disasters like she had done before. This prevented Harris from being up to date on hospital internal responses and diminished her chances for promotion.

130.   Ross emailed Harris on May 23, 2012 requesting that they conduct bi-weekly meetings regarding problems that he was having with her.

131.   On October 3, 2012 Harris had a courier driver removed from the route which is a function that falls under the authority of the Courier Supervisor and something that Harris had done many times while working for Winchester. On October 5, 2012 Ross questioned Harris about the removal and threatened disciplinary action against her. Ross had the driver reinstated. Ross then told Harris that she must first obtain approval from himself, Larry Pickering or George Jonaitis ("Jonaitis"). He did not mention Jonaitis' boss who is a woman.

132.   On November 20, 2012, Roberto took a photograph of Harris and commented about her looks. Harris asked him to destroy the photo. Roberto did not destroy the photo and then emailed it to Harris which made her extremely uncomfortable. Roberto was not disciplined for this.

133.   Meehan received additional compensation when he was appointed Interim Director while Ross was out of work. Harris did not receive additional compensation when she covered for employees who were out on leave or when a position was vacant. For instance, Harris assumed some Security Manager duties from March 1, 2013 to November 15, 2013.

134.   Ross would not let Harris attend the Physician Orientation in 2013 but instructed a male colleague to attend.

135.    On June 13, 2013 Ross gave "Spot Awards" to male employees but excluded

Harris despite that Harris had taken on many additional responsibilities without additional

compensation.

136.    Bella assumed an interim position in 2013 and is given additional compensation.

As previously stated, when Harris assumed an interim position she was not given additional

compensation.

137.    Ross repeatedly lost Harris' self evaluation for 2013 despite that it was on

Winchester's computer system as of March 1, 2013.

138.    In August 2013 a nurse manager reported an incident in which a father threw a

vase in the room with a new born baby present. Roberto yelled and screamed at Harris about how

the nurse manager was wrong in the presence of several co-workers.

139.    On September 10, 2013, Roberto sent an email to Harris containing personal

medical information about a Security Officer that potentially violated HIPAA. Harris responded

that Roberto should be careful about protecting employee's privacy. Roberto then yelled at

Harris for approximately fifteen minutes about a variety of issues.

140.    In addition, Roberto yelled and screamed at Harris on September 16, 2013 and

September 18, 2013.

141.    Senior management at Winchester was aware of Roberto's conduct. However,

Roberto was not disciplined. At the same time, Harris had been placed on a PID and PIA for

allegations of a lesser nature.

142.    Robertson sent an email claiming that staff was picking on Roberto. Robertson

reached this conclusion without speaking to any of the shuttle drivers or security officers or

Harris.

143.    Robertson is the same person who upheld disciplinary charges against Harris predicated on much more minor allegations.

144.    On October 3, 2013 Harris met with Ross and Robertson when she was given her evaluation for 2013. Robertson said that he attended the meeting to ensure that Harris received a "fair" review from Ross.

145.    During the meeting Ross said that there were times when he was met with resistance when assigning work to Harris. When asked for specifics, Ross said that Harris asked questions when Ross asked her to make a sign for a door. All that Harris had done was to ask for clarification regarding the sign.

146.    On October 14, 2013 Ross sent an email to Harris scolding her for clocking in early. Harris followed proper procedure by noting the reason for clocking in early on her time card. The reason was that she was covering payroll for the Security Manager position.

147.    Throughout 2013 and continuing to present Ross demanded that Harris perform secretarial tasks on his behalf. He did not make similar demands to male employees.

148.    On October 21, 2013, Ross submitted a memo regarding STP Management that acknowledged that Harris would continue to cover the Security Manager position regarding scheduling and payroll as she had done since June 2013. Harris did not receive additional compensation for this.

149.    Throughout 2013 and continuing to present Harris has been precluded from attending programs, meetings, classes, and seminars.

150.    On November 11, 2013 Harris advised Human Resources that she would be taking off three days due to a health condition. On November 12, 2013 Ross called Harris at home and accused her of being absent without leave.

151.    On November 15, 2013 Ross removed Harris from the security schedule in retaliation for her complaints of discrimination.

152.    In November or December 2013 Ross instructed staff to stop emailing nightly reports to Harris.

153.    Harris had been receiving these reports for years and needs them in order to properly perform her job.

154.    On December 12, 2013, Harris was called into an unscheduled meeting with Ross and Merrill regarding Harris' removal from the distribution list.

155.    On December 18, 2013, during a staff meeting, Ross announced to the group that Harris was in charge of laundry and he would have Harris get all the jackets cleaned. Harris was mortified to hear that her boss told her colleagues that she was now in charge of doing the office laundry, a duty that she never had in the past.

156.    Removing Harris from the email distribution list, assigning laundry to her and failing to fairly consider her for the promotion are examples of gender discrimination and retaliation.

157.    Harris' daughter, Courtney, has been employed by Winchester for more than two years without being the subject of any discipline.

158.    On December 28, 2013, Courtney's Supervisor, Brian Anderson ("Anderson"), said that he was instructed to speak with her about her being insubordinate several weeks ago. Anderson was not able to give any specifics about how and when Courtney was insubordinate. Anderson then said that he was thinking of putting Courtney "back downstairs" to work in the kitchen. This would be a demotion and would humiliate Courtney in the presence of her colleagues.

159.  The discipline of Courtney was done in retaliation of Harris' complaints of gender discrimination.

160.  On December 30, 2013, Ross attempted to exclude Harris from office operations.

161.  On January 2, 2014, Harris found an open stapler on her desk. Ross demanded that Harris fill the office staplers. This is a task that he has never given to male employees. This disparate treatment humiliated Harris. Throughout the winter of 2013 and spring of 2014 it was requested that Harris order supplies for her male colleagues.

162.  Roberto frequently disregarded Harris' authority and told their fellow male colleagues that Harris has no authority according to Ross.

163.  Harris was excluded from a meeting on January 3, 2014 that was attended by several male colleagues despite that Harris was expected to arrange the meeting and one of the items on the agenda concerned an issue handled by Harris.

164.  Throughout late 2013 and 2014 Ross referred to other females in a derogatory manner. The following are illustrations of comments that he made:

a.  He referred to Director Catharine Robertson as the "queen bee;"

b.  Ross often referred to ED Manager Donna O'Brien as "incompetent;"

c.  He said that Nurse Manager Donna Sherrill doesn't know anything and doesn't know what she's talking about when it comes to infant protection;

d.  Ross complained constantly when he had to deal with Lisa Paolillo, Director of Legal Services, saying she acts like she knows more than she does and she drags her feet on paperwork; and

e.  Ross commented that Vice President Anne Lang is not a nice person because she questioned him on a security situation.

165.    Ross did not make similar comments about male colleagues.

166.    On January 7, 2014 Harris was excluded from a meeting attended by many of her colleagues with a vendor involving issues that concerned Harris as well as her male colleagues.

167.    On January 14, 2014 an email was sent regarding the 2014 Launching Leaders program. Potential participants must be nominated by their direct supervisor. Ross did not nominate Harris. Ross refused to nominate Harris for each year that this program has been in existence.

168.    On January 17, 2014, Harris learned that she would still be in charge of laundry. Once again, this is a demoralizing task assigned to Harris as opposed to other male employees.

169.    In January 2014 Harris handled Security and Shuttle payroll functions without any additional compensation.

170.    During the winter of 2013 and spring of 2014, staff was repeatedly instructed to go to Knight, Bella or Ross with operational issues. Staff was not instructed to go to Harris with operational issues.

171.    On February 18, 2014 Security Officer Joe Greco was reprimanded by Ross for attempting to refer a call from an evening shift officer to Harris.

172.    On February 28, 2014, Harris received her annual performance evaluation in which she was rated only a "Valued Contributor" which resulted in a lower raise.

173.    During the winter of 2013 and spring of 2014 Ross repeatedly excluded Harris from work falling under her role and instead delegated secretarial tasks to her.

174.    In the spring of 2014 Harris was excluded from a Courier Discussion even though Harris was the Courier Supervisor who runs the courier service for the hospital. Instead, only male colleagues were invited to attend the Courier Discussion.

175.    On May 1, 2014 the Defendant implemented the new optimized Hospital Satellite Routes, (Routes A, B, C, D and E). Harris was left out of the process.

176.    Throughout the spring of 2014 Ross became increasingly belligerent towards Harris. He refused to answer questions or to otherwise clarify tasks assigned to her.

## AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION
## GENDER DISCRIMINATION UNDER TITLE VII

177.    Plaintiff repeats, reiterates, and realleges each and every one of the allegations contained in Paragraphs "1" through "176" with the same force and effect as if set forth more fully herein.

178.    The Defendant treated Harris differently than other similarly situated employees.

179.    The Defendant refused to promote Harris, provide her with opportunities to participate in programs, attend important meetings, and to perform the functions of the position originally assigned to her.

180.    Instead, the Defendant assigned secretarial tasks to Harris in order to demean and humiliate her.

181.    The Defendant instructed colleagues that they should not report operation matters to Harris and should refer the matters to her male colleagues.

182.    When the Defendant did assign additional tasks to Harris, she was not given additional compensation unlike her male colleagues when they were assigned additional tasks.

183.    All of the above was done in an effort to doom Harris to failure.

184.    The Defendant's actions were motivated by discrimination based upon gender.

185.    As a result of the Defendant's conduct, Harris has been caused to suffer severe economic and emotional damages in the sum of $5,000,000.00.

## AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION

## TITLE VII-RETALIATION

186.    Plaintiff repeats, reiterates, and realleges each and every one of the allegations contained in Paragraphs "1" through "185" with the same force and effect as if set forth more fully herein.

187.    Harris reasonably believed that she was the victim of discrimination based upon her gender.

188.    Harris made internal complaints and complained to the MCAD and EEOC that she was the victim of discrimination based upon her gender.

189.    The Defendant was aware of Harris' complaints.

190.    Harris suffered adverse employment actions as a result of her complaints which said action included the creation of a hostile work environment, stripping her of responsibilities, assigning demeaning tasks, changing the responsibilities of her position, issuing poor performance evaluations, delaying the issuance of a performance evaluation, and refusing to promote her.

191.    Despite complaining specifically about Ross, the Defendant allowed Ross to continue to make employment decisions concerning Harris even after he was made aware of her complaints.

192.    The Defendant's actions were taken in retaliation for Harris' complaints of discrimination.

193.    But for Harris' complaints she would not have been the victim of discrimination.

194.    As a result of the Defendant's conduct, Harris has been caused to suffer severe economic and emotional damages in the sum of $5,000,000.00.

## AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION
## GENDER DISCRIMINATION UNDER MASSACHUSETTS' LAW

195.    Plaintiff repeats, reiterates, and realleges each and every one of the allegations contained in Paragraphs "1" through "194" with the same force and effect as if set forth more fully herein.

196.    The Defendant treated Harris differently than other similarly situated employees.

197.    The Defendant refused to promote Harris, provide her with opportunities to participate in programs, attend important meetings, and to perform the functions of the position originally assigned to her.

198.    Instead, the Defendant assigned secretarial tasks to Harris in order to demean and humiliate her.

199.    The Defendant instructed colleagues that they should not report operation matters to Harris and should refer the matters to her male colleagues.

200.    When the Defendant did assign additional tasks to Harris, she was not given additional compensation as was the case with her male colleagues when they were assigned additional tasks.

201.    All of the above was done in an effort to doom Harris to failure.

202.    The Defendant's actions were motivated by discrimination based upon gender.

203.    As a result of the Defendant's conduct, Harris has been caused to suffer severe economic and emotional damages in the sum of $5,000,000.00.

## AS AND FOR PLAINTIFF'S FOURTH CAUSE OF ACTION
## RETALIATION UNDER MASSACHUSETTS' LAW

204. Plaintiff repeats, reiterates, and realleges each and every one of the allegations contained in Paragraphs "1" through "203" with the same force and effect as if set forth more fully herein.

205. Harris reasonably believed that she was the victim of discrimination based upon her gender.

206. Harris made internal complaints and complained to the MCAD and EEOC that she was the victim of discrimination based upon her gender.

207. The Defendant was aware that made Harris' complaints.

208. Harris suffered adverse employment actions as a result of her complaints which said action included the creation of a hostile work environment, stripping her of responsibilities, assigning demeaning tasks, changing the responsibilities of her position, issuing poor performance evaluations, delaying the issuance of a performance evaluation, and refusing to promote her.

209. Despite complaining specifically about Ross, the Defendant allowed Ross to continue to make employment decisions concerning Harris even after he was made aware of her complaints.

210. The Defendant's actions were taken in retaliation for Harris' complaints of discrimination.

211. But for Harris' complaints she would not have been the victim of discrimination.

212. As a result of the Defendant's conduct, Harris has been caused to suffer severe economic and emotional damages in the sum of $5,000,000.00.

## JURY DEMAND

213.   The Plaintiff demands a jury trial of this action.

WHEREFORE, The Plaintiff demands judgment as follows:

a)   Declaring the actions, patterns and practices of the Defendant, its agents, servants and all those acting in concert with them, constituted, and does constitute a violation of Title VII and Massachusetts' law;

b)   Permanently enjoining the Defendant, its agents, servants and all those acting in concert with them, from violating Title VII and Massachusetts' law;

c)   An award for economic damages which include lost wages and lost benefits;

d)   An award for emotional damages and punitive damages;

e)   An award for pre and post-judgment interest, costs, disbursements, statutory, compensatory, and exemplary damages;

f)   An award for counsel fees; and

g)   For such other and further relief as this Court deems just and proper

Dated: July 7, 2014
Boston, Massachusetts

Yours, etc.,

THE WAGNER LAW GROUP,
A PROFESSIONAL CORPORATION
*Attorneys for Plaintiff*
David G. Gabor, Esq. (BBO # 624971)
99 Summer Street, 13th Floor
Boston, MA 02110
Telephone: (617)357-5200
Facsimile: (617)357-5250